1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                         DISTRICT OF NEVADA

8                                  * * *

9   BRANCH BANKING AND TRUST                )
    COMPANY, a North Carolina banking        )
10  corporation,                             )        2:12-cv-01775-LRH-PAL
                                             )
11                    Plaintiff,             )
                                             )
12   v.                                      )        ORDER
                                             )
13  SOSSAMAN & GUADALUPE PLAZA,              )
    LLC, a Nevada limited liability company; )
14  YOEL INY; NOAM SCHWARTZ; YOEL            )
    INY, Trustee of the Y&T INY FAMILY       )
15  TRUST dated June 8, 1994; NOAM           )
    SCHWARTZ, Trustee of the NOAM            )
16  SCHWARTZ TRUST dated August 19, 1999;    )
    D.M.S.I., LLC, a Nevada limited liability )
17  company; and DOES 1 through 10, inclusive; )
                                             )
18                    Defendants.            )
    _____ )
19

20          Before the Court is Plaintiff Branch Banking and Trust Company's ("Branch Banking")

21  Motion for Summary Judgment as to Liability and Application for Deficiency Judgment Hearing.

22  Doc. #69.[1]  Defendants Sossaman & Guadalupe Plaza, LLC; Yoel Iny; Noam Schwartz; Yoel Iny,

23  Trustee of the Y&T Family Trust dated June 8, 1994; Noam Schwartz, Trustee of the Noam

24  Schwartz Trust dated August 19, 1999; and D.M.S.I., LLC (collectively "Defendants") filed a

25  Response (Doc. #81), to which Branch Banking replied (Doc. #93).  Defendants also filed an

26
    _____
           [1] Refers to the Court's docket number.

Objection to Evidence Submitted in Support of Branch Banking's Motion for Summary Judgment. Doc. #82. Branch Banking filed a Response (Doc. #94), to which Defendants did not reply.

Also before the Court is Defendants' Motion for Summary Judgment. Doc. #99. Branch Banking filed a Response (Doc. #107), to which Defendants replied (Doc. #111). Defendants also filed a Motion to Certify Question to the Nevada Supreme Court. Doc. #114. Branch Banking filed a Response (Doc. #116), to which Defendants replied (Doc. #117).

**I.   Facts and Background**

This action arises out of Defendants' alleged breach of a secured loan agreement. Following a judicial foreclosure sale on the real property securing the loan, Branch Banking filed the present action to obtain a deficiency judgment against Defendants. Doc. #1. The undisputed facts are as follows. On July 28, 2006, Borrower Sossaman & Guadalupe Plaza, LLC ("Borrower") executed and delivered a Promissory Note Secured by Deed of Trust to Colonial Bank, N.A.[2] ("Colonial Bank"), in the original amount of $3,826,000.00 (the "Note"). Doc. #69, Ex. 1A; Doc. #99, Ex. 1. The Note was secured by a Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rents ("Deed of Trust"), dated July 28, 2006, encumbering certain real property in Maricopa County, Arizona (the "Property").[3] Doc. #69, Ex. 1B; Doc. #99, Ex. 2. Also on July 28, 2006, Defendants Yoel Iny, individually and as Trustee of the Y&T Iny Family Trust; Noam Schwartz, individually and as Trustee of the Noam Schwartz Trust; and D.M.S.I., LLC ("Guarantors") executed and delivered to Colonial Bank a Guarantee (the "Guarantee"). Doc. #69, Ex. 1C; Doc. #99, Ex. 3. Pursuant to the Guarantee, the Guarantors guaranteed the payment of all indebtedness of the Borrower under the loan evidenced by the Note (the "Loan"). *Id.*

---

[2]   Thereafter, Colonial Bank, an Alabama banking corporation, became the successor to Colonial Bank, N.A. through conversion from a national banking association to a state-chartered bank. Doc. #69, Ex. 1, ¶11.

[3]   The Deed of Trust was recorded in Maricopa County, Arizona on August 2, 2006. Doc. #69, Ex. 1B; Doc. #99, Ex. 2.

On February 26, 2009, the Note was amended by an Amendment to Promissory Note Secured by Deed of Trust such that the Maturity Date on the Note was extended to May 2, 2009 (the "Amendment"). Doc. #69, Ex. 1D; Doc. #99, Ex. 4. Also on February 26, 2009, a Modification to the Deed of Trust was executed and recorded in Maricopa County, Arizona. Doc. #99, Ex. 5. On July 19, 2009, the Note was again amended by an Amendment to Promissory Note Secured by Deed of Trust such that the Maturity Date on the Note was extended to August 2, 2009. Doc. #69, Ex. IE; Doc. #87, Ex. 6. On August 14, 2009, Colonial Bank was closed by the State Banking Department of the State of Alabama and the Federal Deposit Insurance Corporation ("FDIC") was named receiver in order to liquidate and distribute the assets of Colonial Bank. Doc. #69, Ex. 1F; Doc. #99, Ex. 7. On September 7, 2011, the FDIC executed an Assignment of Security Instruments, Notes and Other Loan Documents (the "Assignment"), to be deemed effective as of August 14, 2009. *Id.* Pursuant to the terms of the Assignment, the FDIC assigned all rights, title, and interest in the Note, the Deed of Trust, and the Guarantee to Branch Banking. *Id.* The Assignment was recorded in Maricopa County, Arizona on November 4, 2011. *Id.*

The Borrower failed to pay the outstanding principal balance of the loan due under the Note on August 2, 2009.[4] Doc. #93, Ex. 2 (Schwartz Depo.), 12:25-13:4. By demand letter dated August 3, 2011 (the "Demand Letter"), Branch Banking indicated its intent to take steps to exercise its rights and remedies under the Loan on or after August 31, 2011. Doc. #67, Ex. 1G. Branch Banking alleges that the Borrower and the Guarantors failed and refused to pay the balance due under the Note. Doc. #1, ¶26. On December 19, 2011, Branch Banking commenced a judicial foreclosure action under the Deed of Trust by filing a Verified Complaint in the Superior Court of

---

[4] Branch Banking alleges that the Borrower failed to pay the outstanding principal balance in the amount of $1,252,585.90, plus accrued interest, due under the Note on August 2, 2009. Doc. #1, ¶23. Pursuant to the terms of the Note, upon default thereunder the interest rate under the Note automatically increased to a default rate equal to five percent (5.00%) in excess of the stated contract rate under the Note. Doc. #69, Ex. 1A, p. 3; Doc. #99, Ex. 1, p. 3.

1  the County of Maricopa, Arizona.  Doc. #99, Ex. 8.  A Default Judgment ordering the judicial

2  foreclosure of the Property in full or partial satisfaction of the outstanding balance due under the

3  Loan via Sheriff's sale was entered by the Superior Court of the County of Maricopa, Arizona, on

4  April 23, 2012.  Doc. #69, Ex. 1H; Doc. #101, Ex. 12.  The Sheriff of the County of Maricopa,

5  Arizona, sold the Property on June 21, 2012, at public auction for a cash bid of $816,000.00 in

6  partial satisfaction of the Loan.  Doc. #69, Ex. 1I; Doc. #101, Ex. 13.

7         On October 10, 2012, Branch Banking filed a Complaint before this Court, alleging claims

8  for deficiency, breach of guarantee, and breach of the covenant of good faith and fair dealing.  Doc.

9  #1.  Branch Banking claims that there is an unpaid principal balance of $1,301,845.00 as of June

10  21, 2012.  *See id.* at ¶30; *see also* Doc. #69, Ex. 1H; Doc. #101, Ex. 12.

11  **II.    Legal Standard**

12         **A.    Summary Judgment**

13         Summary judgment is appropriate only when the pleadings, depositions, answers to

14  interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record

15  show that "there is no genuine issue as to any material fact and the movant is entitled to judgment

16  as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the

17  evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the

18  light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

19  *Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154

20  (9th Cir. 2001).

21         The moving party bears the initial burden of informing the court of the basis for its motion,

22  along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v.*

23  *Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the

24  moving party must make a showing that is "sufficient for the court to hold that no reasonable trier

25  of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259

26  (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

On an issue as to which the non-moving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party.  *See id.* at 252.  Finally, whereas here, both sides have moved for summary judgment, the court must consider evidence submitted in support of both motions before ruling on either motion.  *See Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### B.    Motion to Certify Question to the Nevada Supreme Court

Pursuant to Nevada Rule of Appellate Procedure ("NRAP") 5:

> The [Nevada] Supreme Court may answer questions of law certified to it by . . . a United States District Court . . . when requested by the certifying court, if there are involved in any proceeding before th[at] court[] questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of this state.

### III.    Cross Motions for Summary Judgment

Branch Banking contends that this is a straightforward breach of contract case, in which the Borrower and the Guarantors failed to repay their loan obligations under the Note and the Guarantee, thereby entitling Branch Banking to summary judgment as to liability against

1   Defendants.  The Court agrees.  In a breach of contract action, Nevada law requires that the

2   plaintiff establish (1) the existence of a valid contract, (2) performance by the plaintiff, (3) breach

3   by the defendant, and (3) damage as a result of the breach.  *See Saini v. Int'l Game Tech.*, 434 F.

4   Supp. 2d 913, 919-20 (D. Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 405 (Nev.1865));

5   *see also Anahuac Mgmt. v. Mazer*, No. 2:09-cv-01590-RLH-PAL, 2012 WL 1142714, at *3 (citing

6   *Calloway v. City of Reno*, 116, Nev. 250, 993 P.2d 1259, 1263 (2001)).  In addition, Nevada law

7   provides that a guarantor is "liable on his own obligation, which is absolute and independent of the

8   note itself."  *Randono v. Turk*, 86 Nev. 123, 466 P.2d 218, 223 (1970).

9       Here, it is undisputed that the Loan documents (i.e., the Note, the Deed of Trust, and the

10   Guarantee) are valid and enforceable contracts.[5]  Similarly, Defendants do not dispute Branch

11

12       [5]  It is indisputable that Nevada law governs the Note.  *See* Doc. #69, Ex. 1A; Doc. #99, Ex. 1

13   ("This Note shall be construed and enforced in accordance with the laws of the State of Nevada. . . .
    Borrower agrees that Lender shall have the rights and remedies available to a creditor under the laws

14   of the State of Nevada."  It is further indisputable that Arizona law governs the foreclosure under the
    Deed of Trust.  *See* Doc. #69, Ex. 1B; Doc. #99, Ex. 2 ("Notwithstanding the fact that the contractual

15   rights and obligations of the parties under the Note and Loan Agreement are to be governed by and
    construed under the laws of the State of Nevada, the provisions of this Deed of Trust relating to the

16   foreclosure of the lien hereof or the exercise of the power of sale contained herein shall be governed
    by the laws of the State of Arizona.").  Lastly, it is indisputable that Nevada law governs the Guarantee.

17   *See* Doc. #69, Ex. 1C; Doc. #99, Ex. 3 ("This Guarantee shall be governed by and construed in
    accordance with the laws of the State of Nevada.").

18

19       To the extent that Defendants challenge the admissibility of the loan documents, their objection

20   is overruled.   Specifically, Defendants challenge Dennis Harms' Declaration  as a means to
    authenticate the loan documents.  *See* Doc. #82.  Defendants aver that Harms has no personal

21   knowledge of the documents because they were issued by Colonial Bank, not Branch Banking, and
    there is no evidence that Harms ever worked for Colonial Bank or otherwise has personal knowledge

22   of its business records.  *See id.*  The Court rejects Defendants' argument and finds that Harms is
    competent to lay the foundation for each exhibit in Branch Banking's Motion for Summary Judgment.

23   Moreover, Defendants have independently authenticated the loan documents.  Ronnie Schwartz,
    Defendants' Person Most Knowledgeable, acknowledged and authenticated each of the loan documents

24   at issue and testified that there is no writing evidencing any alleged oral loan modification.  *See* Doc.
    #93, Ex. 2 (Schwartz Depo.), 4:23-5:1, 6:17-12:24.

25

26       Defendants also challenge the admissibility of Branch Banking's evidence regarding the interest

6

Banking's standing as the legitimate successor-in-interest to Colonial Bank for the purposes of this Loan.  Pursuant to the Note, the Borrower agreed "to pay to [Lender] . . . , in legal tender of the United States of America," the outstanding amount due under the Note on August 2, 2009.  Doc. #69, Ex. 1A, Ex. 1E; Doc. #99, Ex. 1, Ex. 6.  The Note further states that "[f]ailure to make any payment of principal and/or interest within fifteen (15) days after the due date thereof or to otherwise perform . . . shall constitute default" under the Note.  *Id.*  It is undisputed that the Borrower received the requested funds pursuant to the Loan documents.  It is further undisputed that the Borrower failed to repay the debt under the Note when it became due on August 2, 2009.  Accordingly, the Court finds that the Borrower breached the Note when it failed to repay Branch Banking on August 2, 2009.  Similarly, the Guarantors each executed the Guarantee, pursuant to which each Guarantor "unconditionally guarantee[d] the payment, when due, of the indebtedness of Borrower to Lender . . . ."  Doc. #69, Ex. 1C, ¶1; Doc. #99, Ex. 3, ¶1.  It is undisputed that the Guarantors failed to repay the Borrower's debt under the Note when it became due on August 2, 2009.  Accordingly, the Court finds that the Guarantors breached the Guarantee when they failed to repay the debt upon the Borrower's default.

Defendants oppose judgment in favor of Branch Banking on the following grounds: (1) Branch Banking's judicial foreclosure complaint did not request a monetary judgment as required by Arizona law, thereby extinguishing Branch Banking's right to pursue a deficiency against the Borrower; (2) Branch Banking destroyed the Guarantors' subrogation rights against the Borrower, thereby extinguishing Branch Banking's right to pursue recovery against the Guarantors; (3) Branch Banking did not carry its burden of establishing the "consideration paid" element for a deficiency action under NRS 40.459(1)(c); (4) Branch Banking did not carry its burden of

---

and principal owing and due on the Loan.  However, as Branch Banking correctly avers, their Motion for Summary Judgment is limited to the issue of liability.  Nevada law requires an evidentiary hearing to establish damages in deficiency judgment cases.  *See* NRS 40.455 *et seq.*  As such, the Court declines to rule on the admissibility of any evidence purporting to calculate the  interest and principal owing and due on the Loan at this juncture.

establishing that there is any "indebtedness" owed pursuant to NRS 40.459; and (5) Branch

Banking is bound by its admission that the fair market value of the Property was $1,020,000.00.[6]

*See* Doc. #81; Doc. #99.  The Court will address each of Defendants' arguments in turn.

> **A.**    **Branch Banking's Failure to Request or Obtain a Money Judgment in the Judicial Foreclosure Action in Arizona Does Not Affect Its Right to Pursue a Deficiency in Nevada**

Defendants contend that Branch Banking is barred from recovering a deficiency on the debt

from the Borrower because Branch Banking did not obtain a monetary judgment for the entire

amount owed on the Note in the judicial foreclosure action in accordance with Arizona law.[7]

Defendants' argument in this regard is without merit.  The Note specifically provides that "[t]his

Note shall be construed and enforced in accordance with the laws of the State of Nevada."  Doc.

#69, Ex. 1A; Doc. #99, Ex. 1.  The Note further provides that "Borrower agrees that Lender shall

have the rights and remedies available to a creditor under the laws of the State of Nevada."  *Id.*

Similarly, the Guarantee provides that "[t]his Guarantee shall be governed by and construed in

accordance with the laws of the State of Nevada."  Doc. #69, Ex. 1C; Doc. #99, Ex. 3.  Finally, the

Deed of Trust confirms that the Note and, thus, the debt shall be governed by Nevada law:

> Notwithstanding the fact that the contractual rights and obligations of the parties under the Note and Loan Agreement are to be governed by and construed under the

---

[6]  To the extent Defendants' Opposition incorporates argument from earlier Motions for Summary Judgment, the Court declines to entertain that argument as a basis on which to deny Branch Banking's Motion for Summary Judgment.  On November 20, 2013, the Court issued an Order denying Defendants' piecemeal Motions for Summary Judgment (Doc. #40, Doc. #64, Doc. #70, Doc. #84) as an inappropriate attempt to circumvent the page limitations of Local Rule 7-4.  Doc. #89.  The Court will, however, consider Defendants' present Motion for Summary Judgment (Doc. #99) in ruling on Branch Banking's Motion for Summary Judgment.

To the extent Defendants oppose summary judgment on the basis of Branch Banking's alleged breach of an oral "Work-Out Agreement" to forebear enforcing certain rights under the Loan documents, the Court has already rejected Defendants' position.  *See* Doc. #112 (Order granting Branch Banking's Motion to Dismiss Defendants' Counterclaims with prejudice).

[7]  Defendants do not otherwise assert that Branch Banking failed to comply with the Arizona judicial foreclosure process.

laws of the State of Nevada, the provisions of this Deed of Trust relating to the foreclosure of the lien hereof or the exercise of the power of sale contained herein shall be governed by the laws of the State of Arizona.

Doc. #69, Ex. 1B; Doc. #99, Ex. 2. Thus, the parties clearly delineated that the rights and obligations of the parties under the Loan would be governed by Nevada law.

In *Sievers v. Diversified Mortgage Investors*, 95 Nev. 811, 603 P.2d 270, 273 (1979), the Nevada Supreme Court confirmed the general proposition that parties to a contract may chose the law applicable in the construction of their contract so long as the parties act in good faith and without the intent to evade the law of the situs. Moreover, in *Key Bank of Alaska v. Donnels*, 106 Nev. 49, 787 P.2d 382, 384 (Nev. 1990), the Nevada Supreme Court confirmed that, in the absence of evidence or argument regarding bad faith or evasion of Nevada law, a provision in the note that it was to be governed by Alaska law was valid and enforceable even though the deed of trust on Nevada real property securing the note provided that the foreclosure was to be governed by Nevada law. Here, there is no indication that the parties acted in bad faith or with an intention to evade Arizona law in selecting Nevada law to govern the Note. Accordingly, the Court finds that the Note contains a valid and enforceable agreement between the parties that Nevada law is to govern the debt and, thus, any action to recover a deficiency. The fact that the Note references the Deed of Trust does not change the Court's conclusion in this regard.

Indeed, the distinction between a borrower's debt and any security which secures that debt obligation is well established under both Nevada and Arizona law. Nevada law provides that an action on a debt arises out of the promissory note itself, not any security interest that secures the debt obligation, such as a deed of trust. *See Key Bank of Alaska v. Donnels*, 106 Nev. 49, 787 P.2d 383, 384 (1990) ("an action for a deficiency after partial satisfaction through sale of the security is an action on the debt"); *Behringer Harvard Lake Tahoe, LLC v. Bank of Am., N.A.*, No. 3:13-cv-00057-MDD-PAL, 2013 WL 4006867, at *4 (D. Nev. August 5, 2013). Similarly, Arizona courts recognize that "the source of a borrower's debt is the promissory note, not the trustee's sale: 'the foreclosure or trustee's sale is ancillary to the collection of the debt, not the other way around.'"

9

*Morgan AZ Fin., L.L.C. v. Gotses*, No. 1 CA-CV 13-0046, 2014 WL 1910967, at *2 (Ariz. App. May 13, 2014) (quoting *Nat'l Bank of Ariz. v. Schwartz*, 230 Ariz. 310, 283 P.3d 41, 44 (App. 2012)).  In *Schwartz*, the court recognized that "the contractual debt is foremost with any foreclosure or sale being secondary and merely a means of recovery on the original debt."  283 P.3d at 44.  As such, Branch Banking's contractual right to pursue recovery on the debt is separate and distinct from its right to pursue recovery on the property securing that debt.

Applying Nevada law related to deficiency judgments, the Court finds that Branch Banking is not precluded from bringing a second action on the Note to recover a deficiency.  Nevada deficiency legislation provides that:

> upon application of the judgment creditor or the beneficiary of the deed of trust within 6 months after the date of the foreclosure sale or the trustee's sale held pursuant to NRS 107.080, respectively, and after the required hearing, the court shall award a deficiency judgment to the judgment creditor or the beneficiary of the deed of trust if it appears from the sheriff's return or the recital of consideration in the trustee's deed that there is a deficiency of the proceeds of the sale and a balance remaining due to the judgment creditor or the beneficiary of the deed of trust, respectively.

NRS 40.455(1).[8]  However, as Defendants point out, the Nevada Legislature also enacted the so-called "one-action" rule, which provides that "there may be but one action for the recovery of any debt, or for the enforcement of any right secured by a mortgage or other lien upon real estate" in which the Court must enter judgment "for the amount found due the plaintiff."  NRS 40.430(1).  "The Nevada one-action rule requires a creditor seeking recovery on a debt to judicially foreclose on all real property encumbered as security for the debt, sue on the entire debt and obtain a deficiency judgment against the debtor in the same foreclosure action."  *Bonicamp v. Vazquez*, 120 Nev. 377, 91 P.3d 584, 586 (2004) (citing *Keever v. Nicholas Beers Co.*, 96 Nev. 509, 611 P.2d

---

[8]  Defendants do not challenge that Branch Banking has complied with the provisions of NRS 40.455(1) by seeking a deficiency judgment within 6 months after the date of the foreclosure sale. Branch Banking foreclosed on the Property via Sheriff's sale on June 21, 2012.  Doc. #100, Ex. 13. Within 6 months thereafter, on October 10, 2012, Branch Banking filed the present action for deficiency.  Doc. #1.

10

1079, 1082 (1980); *Nevada Wholesale Lumber v. Myers Realty*, 92 Nev. 24, 544 P.2d 1204, 1207

(1976)).  In *McDonald v. D.P. Alexander & Las Vegas Boulevard, LLC*, the Nevada Supreme Court

clarified that "the purpose behind the one-action rule in Nevada is to prevent harassment of debtors

by creditors attempting double recovery by seeking a full money judgment against the debtor and

by seeking to recover the real property securing the debt."  121 Nev. 812, 123 P.3d 748, 751 (2005)

(citing *In re Hart*, 50 B.R. 956, 960 (Bankr. D. Nev. 1985), rejected on other grounds by *In re*

*Pederson*, 875 F.2d 781 (9th Cir. 1989)).  As such, "to recover a debt secured by real property in

Nevada, a creditor must seek to recover on the property through judicial foreclosure before

recovering from the debtor personally."[9]  *Id.* at 750.

Here, it appears that if the judicial foreclosure had taken place in Nevada, as opposed to

Arizona, the one-action rule would indeed bar a second action to recover a deficiency under the

Note.  However, as Branch Banking correctly avers, Section 6(c) explicitly exempts from the one-

action rule any act or proceeding "[t]o enforce a mortgage or other lien upon any real or personal

collateral located outside of the state which does not, except as required under the laws of that

jurisdiction, result in a personal judgment against the debtor."  NRS 40.430(6)(c).  Here, the

judicial foreclosure judgment in Arizona did not result in a personal judgment against the

Borrower.  In fact, the judgment explicitly provided that the court's finding that the Borrower owed

Branch Banking $3,447,781.11 "does not create a monetary judgment in favor of [Branch

Banking].  Should [Branch Banking] desire to seek a monetary judgment, it can seek a judgment in

separate proceedings."  *See* Doc. #67-2, Ex. 1G.  Accordingly, the Court finds that the

aforementioned exception applies to exempt Branch Banking from Nevada's one-action rule.

Defendants invoke the language "except as required under the laws of that jurisdiction" in

arguing that the exception does not apply because the judicial foreclosure in Arizona could have

---

[9]  "The one-action rule also applies to a guarantor or surety of a debt on a mortgage or other
contract secured by an interest in real property."  *McDonald*, 123 P.3d at 750 (citing *First Interstate
Bank v. Shields*, 102 Nev. 616, 730 P.2d 429, 430-32 (1986)).

included a personal deficiency judgment.  The parties have not identified, nor is the Court aware of, any Nevada authority interpreting this particular clause in the exception to the one-action rule. Nevertheless, contrary to Defendants' apparent understanding, the Court interprets the exception to apply where an act or proceeding to enforce a mortgage or other lien upon any real or personal collateral located outside of the state <u>does not</u> result in a personal judgment against the debtor. That the judgment in Arizona *could have* included a monetary judgment is beside the point.  It did not.  Moreover, even if Arizona law indeed *requires* that, in order to obtain a monetary judgment on the debt or "deficiency" in Arizona, a money judgment for the entire amount must be issued in the foreclosure action, the Court is nevertheless unpersuaded that the exception does not apply in these circumstances.

Defendants cite Arizona Revised Statute ("ARS") § 33-725(A), which provides that in a judicial foreclosure action, "[w]hen a mortgage or deed of trust is foreclosed, the court shall give judgment for the entire amount determined due, and shall direct the mortgaged property, or as much thereof as is necessary to satisfy the judgment, to be sold."  ARS § 33-727(A) further provides that "if the mortgaged property does not sell for an amount sufficient to satisfy the judgment, an execution may be issued for the balance against the mortgager where there has been personal service, or the defendant has appeared in the action."  Indeed, Arizona courts have stated:

> there is no such thing under [Arizona] law as a *'deficiency judgment'* in the sense that a formal judgment of that description is rendered by the court . . . for the amount not made by the sale of the mortgaged property. *There is only the original judgment for the full amount of the indebtedness, upon which a deficiency may exist* after the issuance and return of the special execution . . .

*Faber v. Althoff*, 168 Ariz. 213, 812 P.2d 1031, 1037 (App. 1990) (quoting *Bank of Douglas v. Neel*, 30 Ariz. 375, 247 P. 132, 134 (1926)) (emphasis in original).  Arizona courts have "construed these two provisions to conclude: first, that a foreclosure judgment *must* specifically provide for the contingency of a deficiency, and that, in the absence of that provision, a deficiency judgment will not be read into the judgment; and second, if the complaint requests such a deficiency provision and the judgment fails to include it, then the matter is in effect litigated and decided adversely to

12

the plaintiff whether or not the record supports such a ruling." *Id.* at 1035 (citing *Greater Ariz. Sav. & Loan Ass'n v. Gleeson*, 5 Ariz. App. 577, 429 P.2d 464, 466 (1967)) (emphasis added). Read together, Section 33-725 and Section 33-727 provide that "if there is to be a deficiency, it shall be provided for in the judgment of foreclosure." *Gleeson*, 429 P.2d at 579.

Recognizing that Arizona law mandates that, in order to obtain a deficiency in Arizona, the judgment in a foreclosure action must "render a defendant liable for the *full* amount of the debt, not just that portion of the debt that will be satisfied from the proceeds of the sale of the property," the Court is nevertheless unpersuaded that Branch Banking is barred from seeking a deficiency judgment pursuant to Nevada law.  While Arizona law envisions a singular enforcement process on the underlying note, Nevada specifically exempts from the one-action rule out-of-state foreclosure actions that do not result in a personal judgment against the debtor.  Here, Branch Banking did not request or receive a deficiency in Arizona.  In these circumstances, Arizona law provides that one will not be read into the foreclosure judgment.  As such, Branch Banking would, in all likelihood, be barred from seeking and/or obtaining a deficiency in Arizona.  Similarly, Branch Banking would not be able to recover a deficiency merely by domesticating the Arizona foreclosure judgment in Nevada.  However, because out-of-state foreclosures that do not result in a personal judgment against the debtor are exempt from Nevada's one-action rule, the Court finds that Branch Banking is not barred from seeking a separate deficiency in Nevada.

**B.      Branch Banking Is Not Barred from Obtaining a Judgment Against the Guarantors**

Defendants next contend that because Branch Banking did not obtain a deficiency judgment against the Borrower in the Arizona judicial foreclosure, thereby barring any further action on the debt against the Borrower, Branch Banking has destroyed the Guarantors' subrogation rights.  As the Court determined that Branch Banking's failure to obtain a deficiency judgment in the Arizona judicial foreclosure does not bar the present action against the Borrower for a deficiency, Defendants' argument is without merit.  Accordingly, the Court finds that Branch

13

Banking is not barred from seeking to recover against the Guarantors in the present action for breach of guarantee.

**C.     NRS 40.459(1)(c) Does Not Apply to the Present Dispute**

Defendants contend that Branch Banking is barred from recovering a deficiency because it failed to present any evidence that consideration was in fact paid for the Loan.  Defendants' argument in this regard is premised upon the assumption that NRS 40.459(1)(c) applies to limit the amount of any deficiency judgment.  AB 273, now codified as NRS 40.459(1)(c), was signed into law on June 10, 2011.  It provides that:

> [i]f the person seeking the judgment acquired the right to obtain the judgment from a person who previously held that right, the amount by which the amount of the consideration paid for that right exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater, with interest from the date of sale and reasonable costs[.]

NRS 40.459(1)(c).  Defendants urge that, because Branch Banking acquired the right to obtain a judgment in this action from the FDIC, any deficiency cannot exceed the "amount of consideration paid."

In *Sandpointe Apartments, LLC, et al. v. The Eighth Judicial District Court, et al.*, 129 Nev. Adv. Op. 87, 313 P.3d 849, 853-59 (2013), the Nevada Supreme Court held that NRS 40.459(1)(c) does not apply to cases where the foreclosure sale occurred before June 10, 2011, because the Nevada Legislature did not intend the statute to be retroactive.[10]  Following this logic, two courts in this district have also concluded that NRS 40.459(1)(c) does not apply retroactively to assignments of debt predating the effective date of the statute on June 10, 2011, as the statute's application to such an assignment would violate the Contract Clause.[11]  *See Eagle SPE NV I, Inc. v. Kiley Ranch*

---

[10] This action does not directly implicate *Sandpointe* as the foreclosure sale occurred on June 21, 2012.

[11] The Nevada Supreme Court did not have occasion in *Sandpointe* to address the applicability of NRS 40.459(1)(c) under the circumstances presented here, i.e., whether the amendment applies retroactively to pre-enactment assignments.

*Cmtys., et al.*, No. 3:12-cv-00245-RCJ-WGC, 2014 WL 1199595, at *3-19 (D. Nev. Mar. 24, 2014) (when applied retroactively to a pre-amendment assignment, NRS 40.459(1)(c) severely impairs the value of the contract in a manner which offends the Constitution); *Branch Banking & Trust Co. v. Regena Homes, LLC, et al.*, No. 2:12-cv-00451-RCJ-GWF, 2014 WL 3661109, at *4 (D. Nev. July 23, 2014) (same); *see also Branch Banking & Trust Co. v. Desert Canyon Phase II LLC*, No. 2:12-cv-01463-JCM-PAL, 2014 WL 2468610, at *3-5 (D. Nev. June 2, 2014) (adopting those portions of *Eagle SPE* related to the retroactive application of NRS 40.459(1)(c) to assignments made prior to the amendment's effective date); *Branch Banking & Trust Co. v. Pahrump 194, LLC, et al.*, No. 2:12-cv-01462-JCM-VCF, 2014 WL 3747644, at *3-4 (D. Nev. July 30, 2014) (same); *Branch Banking & Trust Co. v. Jones/Windmill, LLC, et al.*, No. 2:12-cv-00452-JCM-GWF, 2014 WL 3845410, at *4 (D. Nev. Aug. 5, 2014) (same).

The Court agrees with the reasoning set forth in these decisions.  In *Eagle SPE*, Judge Robert Jones determined that NRS 40.459(1)(c) cannot constitutionally apply to assignments made before the statute's effective date.  2014 WL 1199595, at *7.  In a lengthy and thorough analysis addressing whether application of the statute to pre-enactment assignments would violate the Contract Clause of the United States Constitution[12], the court found first that "the statute substantially impairs any existing assignment by reducing the amount an assignee can recover on debt he already purchased under a legal regime where his potential recovery was not limited by the

---

[12] "Whether a regulation violates the Contract Clause is governed by a three-step inquiry:  The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.  If this threshold inquiry is met, the court must inquire whether the State, in justification, [has] a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem, to guarantee that the State is exercising its police power, rather than providing a benefit to special interests.  Finally, the court must inquire whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.  Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."  *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (citations and internal quotation marks omitted) (alterations in original).

amount he paid for the debt, and without any refund or any other benefit offsetting the loss value." *Id.* at *7.  The court went on to find that while "the amendment had a legitimate public purpose behind it, i.e., the remedying of a broad and general social and economic problem[,]" as applied in these circumstances "[it] creates an unexpected windfall [to mortgagers] as opposed to avoiding one." *Id.* at *8.  As such, the statute's application to pre-enactment assignments would not further the public purpose of reducing foreclosures.  *Id.*  Moreover, the court found that "even if the law could be characterized as an interest-neutral exercise of police power, the adjustment of the rights and responsibilities of the contracting parties is not based upon reasonable conditions."  *Id.* at *8-11.  Accordingly, the court determined that NRS 40.459(1)(c), as applied to pre-enactment assignments, would violate the Contract Clause.  Finally, in addressing NRS 40.459(1)(c)'s retroactive application to pre-enactment assignments, the court concluded that:

> NRS section 40.459(1)(c) applies only where the assignment at issue occurred on or after the effective date of that statute.  A contrary application would violate the Contract Clause.  And the Court need not concoct any improbable interpretation of the statute to save it from constitutional infirmity.  The Court's interpretation of the statute follows easily from the lack of any objectively retroactive language, the lack of any objective necessity for retroactive effect to carry out the statute's purposes, and the clearly expressed subjective intent of the Nevada Legislature.

*Id.*, at *19.

As the Court agrees in full with the reasoning and conclusions set forth therein, the Court shall adopt those sections of *Eagle SPE* related to the retroactive application of NRS 40.459(1)(c) to assignments occurring prior to the statute's effective date.  *See id.* at *3-19.  Here, the FDIC assigned all rights, title, and interest in the Note, the Deed of Trust, and the Guarantee to Branch Banking on August 14, 2009, long before NRS 40.459(1)(c)'s June 10, 2011 effective date.  Accordingly, NRS 40.459(1)(c) does not apply retroactively to limit the amount of any deficiency judgment in this action.  Because NRS 40.459(1)(c) does not apply retroactively to this particular transaction, Defendants' arguments regarding the "amount of consideration paid" and the sufficiency of the evidence in support thereof are moot and need not be resolved.  Additionally, the Court declines to address the additional bases on which Branch Banking argues that NRS

16

40.459(1)(c) does not apply.[13]

> **D.    The Loss Sharing Agreement Is Not an Insurance Policy Under NRS 40.459(2)**

NRS 40.459(2) limits the amount a creditor can recover in a deficiency judgment by providing that:

> the "amount of the indebtedness" does not include any amount received by, or payable to, the judgment creditor or beneficiary of the deed of trust pursuant to an insurance policy to compensate the judgment creditor or beneficiary for any losses incurred with respect to the property or the default on the debt.

Defendants assert that the Loss Sharing Agreement[14] between Branch Banking and the FDIC qualifies as an "insurance policy" under NRS 40.459(2), and that any reimbursement Branch Banking receives from the FDIC for losses declared on the Loan will directly reduce the amount that Branch Banking may recover in a deficiency judgment.  The Court disagrees.

Under the Loss Sharing Agreement, the FDIC is obligated to reimburse Branch Banking for a percentage of any losses Branch Banking declares on the Loan.  The Loss Sharing Agreement requires Branch Banking to use "commercially reasonable best efforts to maximize the collection of amounts due for the loss share assets." Doc. #107, Ex. 1 (Hicks Affidavit), ¶13.  Moreover, Branch Banking is obligated "to continue to pursue the obligors and guarantors of the note even if [Branch Banking] has been reimbursed by the FDIC for a loss on any given asset." *Id.*, ¶16.  Finally, in the event Branch Banking obtains any recovery from the borrowers or guarantors, "it has an obligation under the [Loss Sharing] Agreement to pay a portion of those recoveries to the FDIC based upon the reimbursements that were previously made to [Branch Banking] by the FDIC.  The net effect of this is that if [Branch Banking] receives full payment from a borrower and/or

---

[13]  Branch Banking argues that Defendants' proposed application of NRS 40.459(1)(c) violates the Supremacy Clause and that NRS 40.459(1)(c) does not apply to loans acquired from the FDIC because the FDIC is not a "person" under applicable Nevada law.

[14]  The Purchase and Assumption Agreement, pursuant to which Branch Banking acquired the subject Loan from the FDIC, encompasses the Loss Sharing Agreement presently at issue. *See* Doc. #99, Ex. 17.

guarantor, [Branch Banking] would not receive any reimbursement from the FDIC." *Id.*

In *Branch Banking & Trust Co. v. Frank, et al.*, No. 2:11-cv-01366-JCM-CWH, 2013 WL 5428112, at *6-7 (D. Nev. Sept. 26, 2013), Judge James Mahan confronted precisely the same issue. The court noted that "the statutory scheme regarding deficiency judgment, as a whole, is understood as being built to prevent unjustified windfalls." *Id.* at *6 (referencing the "one-action rule," codified at NRS 40.430, which seeks to prevent creditors from obtaining a double recovery, and the statutory scheme, which prevents creditors from acquiring secured property at an artificially low price in order to increase the amount of a deficiency judgment). The court went on to find that:

> the limitation within [NRS 40.459(2)] seeks to prevent creditors from obtaining a windfall by receiving both a payment for the outstanding balance under an insurance policy and a judgment for the full sum against the debtor. Considering this purpose, it is clear that this provision does not apply to the shared loss agreement between plaintiff and the FDIC. . . . The fact that plaintiff must refund the FDIC based on the amount that it is able to collect from defendants means that there is no possibility that plaintiff will receive double-recovery on this loan. Thus, the statutory intent of [NRS 40.459(2)] is not applicable to his arrangement. In fact, if the court were to consider this arrangement to be an insurance policy, it would defy the purpose of the statutory scheme by giving an unjustified windfall to defendants.

*Id.* at *7. Thereafter, in an order reconsidering these findings, Judge Mahan considered the exact Assembly Committee statement to which Defendants refer in support of their argument that the Nevada Legislature contemplated that the FDIC loss sharing arrangements would fall within the purview of NRS 40.459(2).[15] *Branch Banking & Trust Co. v. Frank, et al.*, No. 2:10-cv-01366-JCM-CWH, 2013 WL 6669100, at *10-11 (D. Nev. Dec. 17, 2013). The court found that the statement "merely reaffirms the conclusion made in the court's prior order" that the loss-sharing agreement in that case did not fall within the purview of NRS 40.459(2). *See id.* (citing

---

[15]   Defendants argue that Assemblyman Marcus Conklin's statement at the Meeting of the Assembly Committee on Commerce and Labor demonstrates that the revisions to NRS 40.459 were intended to prevent a lender from recovering any amount that has already been paid (or should be paid) pursuant to an insurance policy, including a loss sharing agreement with the FDIC. *See* Doc. #99, Ex 23 (Minutes of the Assembly Committee Meeting on Commerce and Labor, Seventy-Sixth Session, March 23, 2011 (related to AB 273))).

Assemblyman Conklin's final clarifying remark that this provision was intended to "prevent a lender from profiting from a judgment").

Here, the Court agrees with Judge Mahan's reasoning and conclusion that the FDIC's loss sharing provisions do not serve to limit a plaintiff's recovery under NRS 40.459(2). The Loss Sharing Agreement at issue is identical in all material respects to the one at issue in *Frank*. Most significantly, in the event Branch Banking recovers anything from Defendants on the Loan, the FDIC will be entitled to a refund based on any reimbursements that were previously made to Branch Banking. As such, there is no possibility that Branch Banking will receive a double recovery. Because there is no possibility of double recovery by Branch Banking, and because a contrary conclusion would leave Defendants with an unjustified windfall, the Court concludes that the Loss Sharing Agreement at issue is categorically different from the type of "insurance policy" contemplated in NRS 40.459(2), and thus does not serve to limit Branch Banking's recovery.

Finally, Defendants argue that, because the FDIC and Defendants are co-obligors to the Loan, they are entitled to an offset of any amounts paid by the FDIC pursuant to NRS 101.040. NRS 101.040 provides that:

> [t]he amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all coobligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.

Without accepting Defendants' suggestion that the FDIC is a co-obligor under NRS 101.040, the Court rejects their argument for the same reasons set forth above. Because there is no possibility that Branch Banking will recover more than the amount to which it is entitled, NRS 101.040 does not serve to limit the amount of any deficiency judgment Branch Banking may obtain.

### E. The Fair Market Value of the Property Shall be Determined at a Deficiency Hearing Pursuant to NRS. 40.455

Defendants urge that Branch Banking should be bound by its prior admissions that the fair market value of the Property was $1,020,000.00. In doing so, they request that the Court issue

partial summary judgment establishing that $1,020,000.00 is the "floor" for any final fair market value determination.  The Court declines to do so.  NRS 40.457(1) provides that "[b]efore awarding a deficiency judgment under NRS 40.455, the court shall hold a hearing and shall take evidence presented by either party concerning the fair market value of the property sold as of the date of foreclosure sale or trustee's sale."  In no unclear terms, NRS 40.457(1) *requires* the Court to hold a hearing and consider all relevant evidence in determining the fair market value of the Property. Accordingly, Defendants will have an opportunity at that time to introduce evidence in support of their argument that the fair market value of the Property was $1,020,000.00.

**IV.    Motion to Certify Question to the Nevada Supreme Court**

Defendants move the Court to certify the following questions of law to the Nevada Supreme Court:

> 1.    How is "the amount of consideration paid" calculated pursuant to the newly enacted NRS 40.459(1)(c) for a specific loan, not purchased individually for cash, but rather as a part of a portfolio of assets in exchange for an assumption of certain liabilities?
>
> 2.    Is the calculation of "the amount of consideration paid" adjusted based on subsequent reimbursements made to an assignee creditor pursuant to a loss-sharing agreement?

Doc. #114, p. 2.

For the reasons discussed in Section III.C., the Court finds that NRS 40.459(1)(c) is not applicable to the instant assignment.  Accordingly, the "amount of consideration paid" is not at issue and certification as to both questions is unnecessary.  *See* Nev. R. App. P. 5(a) (providing that the Nevada Supreme Court may answer questions certified to it by United States district courts if the issues of state law "may be determinative of the cause then pending in the certifying court").

**V.    Conclusion**

In sum, the Court rejects Defendants' argument that summary judgment is not appropriate in this case.  Because there are no disputed issues of material fact, the Court concludes that Branch Banking is entitled to summary judgment on liability as to claim one for deficiency and claim two

for breach of guarantee.[16]  Moreover, Branch Banking's Application for a Deficiency Judgment

Hearing is granted.  The parties shall have an opportunity to submit supplemental briefing

concerning the amount of indebtedness on the Loan and the fair market value of the Property at the

time of the foreclosure sale.  Thereafter, the Court shall set a deficiency hearing pursuant to NRS

40.457(1).


    IT IS THEREFORE ORDERED that Branch Banking's Motion for Summary Judgment as

to Liability and Application for Deficiency Judgment Hearing (Doc. #69) is GRANTED.

    IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. #99)

is DENIED.

    IT IS FURTHER ORDERED that Defendants' Objection to Evidence Submitted in Support

of Branch Banking's Motion for Summary Judgment (Doc. #82) is OVERRULED.

    IT IS FURTHER ORDERED that Defendants' Motion to Certify Question to the Nevada

Supreme Court (Doc. #114) is DENIED.

    IT IS FURTHER ORDERED that judgment shall be entered in favor of Branch Banking

and against Defendants as to claim one for deficiency and claim two for breach of guarantee.

    IT IS FURTHER ORDERED that the parties shall have thirty (30) days from the issuance

of this Order to file opening briefs not to exceed twenty (20) pages concerning the amount of

indebtedness on the Loan and the fair market value of the Property at the time of the foreclosure

---

[16]  The Court notes that Branch Banking did not move for summary judgment on its third claim for breach of the covenant of good faith and fair dealing. *See generally* Doc. #69.  Should Branch Banking elect to proceed on this claim, a proposed joint pretrial order shall be filed within thirty (30) days of the issuance of this Order.

    Additionally, the Court rejects Defendants' argument that summary judgment on liability is not appropriate because Branch Banking has not proven with competent evidence the exact principal and interest owed on the Loan at the time of the foreclosure sale (i.e., "amount of the indebtedness which was secured").  Defendants' argument regarding admissibility of evidence to prove damages is not a necessary element of Branch Banking's Motion for Summary Judgment on liability.

sale.  The parties shall then have ten (10) days thereafter to file response briefs not to exceed ten (10) pages.  Thereafter, the Court will set a deficiency hearing pursuant to NRS 40.457(1).

IT IS FURTHER ORDERED that if Branch Banking elects to proceed on claim three for breach of the covenant of good faith and fair dealing, it shall submit a proposed joint pre-trial order pursuant to Local Rules within thirty (30) days of the issuance of this Order.

IT IS SO ORDERED.

DATED this 15th day of September, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE